IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ANTHONY ROBINSON, | ) | |
| | ) | |
| Plaintiff, | ) | 8:06CV322 |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM AND ORDER ON |
| BURLINGTON NORTHERN-SANTA FE | ) | DEFENDANT'S MOTION FOR |
| RAILROAD, | ) | SUMMARY JUDGMENT |
| | ) | |
| Defendant. | ) | |
| | ) | |

On April 24, 2007, the plaintiff, Anthony Robinson, filed a second amended complaint against the defendant, Burlington Northern Santa Fe Railroad Co. (BNSF), alleging violations of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e et seq.; 42 U.S.C. § 1981; and 42 U.S.C. § 1983.  (See generally filing 50.)  Now before me is the defendant's motion for summary judgment, filing 74.  For the following reasons, I find that the defendant's motion must be granted.

I.   BACKGROUND

In April 1992, the plaintiff, whose name was then Anthony Murphy, applied for a job with the defendant.  (Def.'s Br., Statement of Material Facts, filing 75 (Def.'s Facts), ¶ 3.)  The plaintiff did not disclose on his application that he had been convicted of solicitation in 1987 and receiving an overpayment of unemployment compensation in 1991.  (Id. ¶¶ 2-3.)  In June 1992, he was hired to work for the defendant as a track laborer.  (Id. ¶ 3.)

On February 3, 1993, the plaintiff filed a charge with the Nebraska Equal Opportunity Commission (NEOC) alleging that the defendant discriminated against him on the basis of his race when it failed to select him for a truck driving position.  (Id. ¶ 4.)  Ultimately, the charge was dismissed.  (See id. See also Evidence Index in Supp. of Def.'s Mot. for Summ. J., filing 76 (Def.'s Index), Ex. 77-2.)

1

On some unspecified date, the plaintiff filed a "union grievance" after he was denied a position as head welder foreman. (Def.'s Facts ¶ 5.) It is not clear, however, whether the grievance involved allegations of unlawful employment discrimination or retaliation. Also on an unspecified date, the plaintiff was disciplined for failing to show up for work. (Id. ¶ 6.)[1] The plaintiff grieved this disciplinary decision, and his suspension was reduced from five days without pay to three days without pay. (Id.) Again, it is not clear that this incident had a connection with unlawful employment discrimination or retaliation.

In early 1997, the plaintiff changed his surname from Murphy to Robinson. (Id. ¶¶ 1, 4 (citing Def.'s Index, Ex. 77-6).) Then in February 1999, the plaintiff applied for a position as a train dispatcher with the Union Pacific Railroad. (Id. ¶ 7.) The plaintiff continued to work for the defendant after he submitted his application to Union Pacific; indeed, there is evidence that the plaintiff was disciplined by the defendant in March 1999 for failing to make a timely report of an injury and again in April 1999 for being absent without leave. (See id. ¶¶ 8-9.) At some point in 1999–perhaps between the months of May and August–the plaintiff took family medical leave from his position with the defendant. (Id. ¶ 11.)[2] During this period of leave, the plaintiff underwent dispatcher training at the Union Pacific Railroad. (Id.) Ultimately, however, the plaintiff was discharged from the Union Pacific Railroad after he failed an examination given as a part of the dispatcher training. (Id. ¶ 12.)

On August 19, 1999, the plaintiff resigned from his employment with the defendant. (Id. ¶ 13.) On his resignation notice, the plaintiff wrote, "No longer a career worth pursuing[;] my mental health & family are much more important to me than the silly games played by the company." (Id. (quoting Def.'s Index, Ex. 77-11).) During his deposition, the plaintiff explained that these "silly games" involved "personal favor[s]" that caused the rules for obtaining new

---

[1] The defendant alleges that this event occurred in December 1994. (See Def.'s Facts ¶ 6.) This allegation is not supported by evidence, however.

[2] The defendant suggests that the plaintiff took family medical leave to take care of his son beginning in May 1999 and continuing through August 1999. (Def.'s Facts ¶¶ 10-11.) I note, however, that the evidence cited by the defendant in its statement of facts does not mention these dates.

positions to be applied inconsistently. (Id. (citing Def.'s Index, Ex. 77, Robinson Dep. at 104:17-105:14).) At the time of his resignation, the plaintiff gave no thought to the possibility of returning to work for BNSF. (Id.)

Beginning in April 2002, the defendant began posting job openings on its website. (Def.'s Facts ¶ 20.) These postings included the location of the open position, if known; the primary duties associated with the position; the relevant qualifications; and the "working conditions." (Id.) Applicants were required to submit applications for the open positions via the internet. (Id.) The application form asked the applicants to provide the following information, among other things: 1) the names of any railroads the applicant has worked for in the past; 2) the names of past employers and the reasons for leaving those positions; and 3) a list of any convictions, along with the dates of those convictions. (Id.) Applications would then be screened by the "Human Resources/Medical Department" to determine whether or not the applicant met "the minimum qualifications" and to select the "best qualified applicants" for interviews. (Id. ¶ 21.) Supervisors might also participate "in the screening process for exempt positions, such as management positions." (Id.) If "a significant number of applicants" applied for a position, "then applicants who [were] already in the geographical area where the posted position [was] located would be considered over applicants who [were] not already living in the geographical area of the posted position." (Id.) During this screening process, "[t]he human resource employee and the supervisors . . . would not be aware of an applicant's race or prior employment history with the BNSF, unless the human resources employee knew the applicant, knew the applicant's prior employment history, or reviewed the employee's personnel file." (Id.)

After the screening process was completed, selected applicants were notified of the time and place of their interviews via e-mail. (Id. ¶ 22.) During these interviews, the interviewer or interviewers asked the applicants questions "specific to each position" and scored the applicants' answers. (Id. ¶ 23.) In addition, applicants for positions "such as machinists, maintenance of way [(MOW)] employees, laborers, pipefitters, and conductors" were given tests. (Id.) The candidates were then evaluated based on their interview scores. (Id.) The applicant selected for the open position would then "be conditionally offered a position with the BNSF subject to the following: pre-employment background investigation[,] proof of permanent employment

eligibility in the United States, receipt of a completed BNSF medical history questionnaire and a successful completion of a drug screen, medical screening, medical review, and a physical capability assessment." (Id.)

Beginning in March 2003 and continuing through 2005, the plaintiff applied for forty positions with the defendant. (Id. ¶¶ 17, 24.) These positions are listed in the following chart.

| Number | Description | Code | Location | Application Date |
|---|---|---|---|---|
| 1 | Management Trainee | DB10831 | Systemwide | 3/14/03 |
| 2 | Human Resource Manager | PS11286 | Alliance, NE | 6/29/03 |
| 3 | Conductor Trainee | LM11308 | Whitefish, MT | 6/30/03 |
| 4 | Dispatcher Trainee | KJ11641 | Kansas City, KS | 10/15/03 |
| 5 | Regional Director - HR | DB11680 | Seattle, WA | 10/17/03 |
| 6 | Dispatcher Trainee | KJ12069 | San Bernadino, CA | 2/3/04 |
| 7 | Experienced FLS-Trans | KJ120102 | Stockton, CA | 2/3/04 |
| 8 | Experienced FLS-Trans | KJ120103 | Kansas City, KS | 2/3/04 |
| 9 | Experienced FLS-Trans | KJ120107 | Seattle, WA | 2/3/04 |
| 10 | Experienced FLS-Trans | KJ120108 | Houston, TX | 2/3/04 |
| 11 | Experienced FLS-Mech | KJ12006 | San Bernadino, CA | 2/3/04 |
| 12 | Coach Cleaner | HE12095 | Chicago, IL | 2/3/04 |
| 13 | MOW Truck Driver | HE12098 | Chicago, IL | 2/3/04 |
| 14 | Placement Center Clerk | DB12070 | Fort Worth, TX | 2/3/04 |
| 15 | Clerk Operator | HE12058 | Galesburg, IL | 2/3/04 |
| 16 | MOW-Track Laborer | PS12084 | Sioux City, IA | 2/3/04 |
| 17 | Assistant Trainmaster | TL12064 | Belen, NM | 2/3/04 |
| 18 | MOW Truck Driver | DB12531 | Los Angeles, CA | 5/13/04 |
| 19 | MOW Truck Driver | TL125515 | Phoenix, AZ | 5/13/04 |

| 20 | Mechan. Laborer/Hostler Helper | DB12573 | Los Angeles, CA | 5/17/04 |
|---|---|---|---|---|
| 21 | Telecommunication Maintainer | LM12586 | Whitefish, MT | 5/17/04 |
| 22 | Asst Mgr TY&E Comp | KJ13096 | Topeka, KS | 8/22/04 |
| 23 | Carman | PS13081 | Lincoln, NE | 8/22/04 |
| 24 | Trainmaster (Terminal) | PS13111 | Kansas City, KS | 8/22/04 |
| 25 | Assistant Roadmaster (System) | KH13091 | Kansas | 8/22/04 |
| 26 | Pipefitter | PS13303 | Lincoln, NE | 10/5/04 |
| 27 | Mechanical Laborer | PS13504 | Lincoln (Havelock) NE | 11/19/04 |
| 28 | Human Resource Generalist | KC13549 | Kansas City, KS | 11/23/04 |
| 29 | Asst Roadmaster (Support) | KH13550 | Undetermined | 11/30/04 |
| 30 | Experienced Train Dispatcher | DF14422 | Various Locations | 4/15/05 |
| 31 | Asst Mgr Hub Operations | FM13800 | Chicago, IL | 4/15/05 |
| 32 | MOW Various Positions | HE14453 | Memphis, TN | 4/15/05 |
| 33 | Ticket Agent GREB | LP14463 | Aurora, IL | 4/15/05 |
| 34 | MOW Truck Driver | SH14664 | Kansas City, KS | 5/10/05 |
| 35 | Assistant Roadmaster (System) | MT15034 | Lincoln, NE | 7/31/05 |
| 36 | Trainmaster (Terminal) | PS15665 | Lincoln, NE | 10/27/05 |
| 37 | Manager Roadway Planning | KH15664 | Vancouver, WA | 10/27/05 |
| 38 | Track Maintenance - Various Positions | PS158757 | Omaha, NE | 12/8/05 |
| 39 | Railcar Repair | CM15912 | Chicago, IL | 12/08/05 |

|     |     |     |     |     |
| --- | --- | --- | --- | --- |
| 40  | Various Mechanical Positions | HE15334 | Memphis, TN | 12/31/05 |

(Id.) In addition, on February 4, 2004, the plaintiff submitted an application in response to an "FLS Assessment Center Posting for Transportation, Engineering, Mechanical, Clerical," code KJ12030. (Id. ¶ 26; see also Def.'s Index, Ex. 82, Sherlock Dec. ¶ 24.) According to Pam Sherlock, who currently serves as the defendant's Director of Staffing, "[t]his was not a posting for a specific position but was an invitation to BNSF employees to be tested to become First Line Supervisor ('FLS') certified." (Def.'s Index, Ex. 82, Sherlock Dec. ¶ 24.)

It appears that the plaintiff submitted a single application covering positions 1-29 listed on the foregoing chart, along with position KJ12030. (See Def.'s Index, Ex. 77-20 at 1-2.) On this application, the plaintiff indicated that his home address was in Omaha, Nebraska. (Id. at 1.) He also indicated that he did not have any prior convictions, and he failed to identify Union Pacific Railroad as a prior employer. (See id.) The plaintiff did indicate that he was employed previously by the defendant, and he stated the following reason for leaving that position: "Divorced and awarded custody of my three small children, boys ages 11, 5, and 3 now." (Id.) The plaintiff also indicated on his application that he expected to receive a BA from Bellevue University in 2003, though the resume appended to his application states that he expected to graduate in May 2004. (Compare id. at 4 with id. at 8.)[3] The plaintiff was invited to interview for the position of Maintenance of Way Track Laborer–listed as job number 16 on the foregoing chart–but the plaintiff failed to appear for his interview. (Def.'s Facts ¶ 25.) The plaintiff was not hired to fill any of the positions that he specified in this application.

On October 21, 2004, the plaintiff filed a charge with the NEOC and Equal Employment Opportunity Commission (EEOC) alleging that the defendant retaliated against him and discriminated against him based upon his race, color, sex, and age when by failing to hire him for positions 1-21 listed on the foregoing chart, along with position KJ12030. (Def.'s Facts ¶ 37.) On November 18, 2005, the NEOC reached a final determination of "no reasonable cause" and closed the charge. (Id. ¶ 42 (citing Def.'s Index, Ex. 80-28 and Ex. 81 at 8).)

---

[3] The plaintiff had not obtained his degree at the time of his deposition in this case on August 30, 2007.

On December 8, 2005, the plaintiff applied for the position of "Track Maintenance-Various Positions," which appears as entry number 38 on the foregoing chart. (Def.'s Facts ¶ 39.) The plaintiff was invited to interview for the position. (See id.) When the plaintiff appeared for his interview, he supplemented his application by adding notes of his previous convictions. (See id.; see also Def.'s Index, Ex. 78-75.)[4] He did not note his previous employment with the Union Pacific Railroad, however. Carmen Turner, "a BNSF Roving Human Resources Manager," conducted the plaintiff's interview. (Def.'s Facts ¶ 40.) "Turner used a structured interview guide that was used for all interviews [for] this position," and she scored the plaintiff's interview at 18 points. (Id.) The plaintiff was not selected for the position. The defendant has submitted evidence that all of the persons who were hired scored 20 or above on their interviews. (Id.; see also Def.'s Index, Ex. 82, Sherlock Dec. ¶ 47.)

On September 28, 2006, the plaintiff filed a charge of discrimination with the NEOC and EEOC alleging that the defendant retaliated against him and discriminated against him based upon his race, color, sex, and age by failing to hire him "for laborer, truck driver, welder, and foreman positions" that the plaintiff applied for "[i]n June or July of 2005." (Def.'s Index, Ex. 77-61. See also Def.'s Facts ¶ 41.) The resolution of this charge, if there has been one, has not been revealed to me.

On April 24, 2007, the plaintiff, through counsel, filed a three-count amended complaint against the defendant. (See Second Am. Complaint, filing 50.)[5] Count I alleges that "BNSF's failure to interview and hire Plaintiff from 2001 to 2004 was in retaliation for Plaintiff's filing union grievances and harassment claims against BNSF while he was employed by BNSF" in violation if Title VII, § 1981, and § 1983. (See id. ¶¶ 15-17.) Count II alleges that "BNSF's failure to hire Plaintiff after interviewing him in 2005 was in retaliation for his filing union grievances, harassment claims and charges against BNSF with the Nebraska Equal Opportunity

---

[4] The plaintiff's corrected application also includes all forty of the positions listed in the foregoing table, along with position KJ12030. (See Def.'s Index, Ex. 78-75.)

[5] The original complaint in this case was filed by the plaintiff pro se on April 17, 2006. (See Compl., filing 1.) I note in passing that the original complaint was filed before the plaintiff filed his administrative charge of September 28, 2006.

Commission" in violation of Title VII, § 1981, and § 1983.  (See id. ¶¶ 18-20.)  Count III alleges that "BNSF's failure to interview and hire Plaintiff between 2001 and 2004, and BNSF's failure to hire Plaintiff after interviewing him in 2005 was discrimination based on Plaintiff's race" in violation of Title VII, § 1981, and § 1983.  (See id. ¶¶ 21-23; see also id. ¶ 1 (stating that the plaintiff is African American).)

On October 3, 2007, the defendant filed the instant motion for summary judgment.  (See filings 74-76.)  A supplemental exhibit in support of the motion was filed on November 27, 2007.  (See filings 80-81, 83-84.)  The plaintiff did not file a timely response to the defendant's motion.  (See filings 86-87, 89, 97.)

## II.   STANDARD OF REVIEW

A motion for summary judgment shall be granted by the court "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A "material" fact is one that "might affect the outcome of the suit under the governing law," and a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party.  Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970).  If the moving party meets the initial burden of establishing the nonexistence of a genuine issue, then the burden shifts to the nonmoving party to produce evidence of the existence of a genuine issue for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment," Anderson, 477 U.S. at 257, and "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial," id. at 256 (citing Fed. R. Civ. P. 56(e)).

### III. ANALYSIS

The defendant argus that it is entitled to summary judgment on each of the plaintiff's claims. I shall analyze each of the defendant's arguments below in turn.

#### A. Section 1983

Counts I-III of the second amended complaint are each based, in part, on 42 U.S.C. § 1983. (See generally Second Am. Compl., filing 50.) "To establish a § 1983 cause of action, [a plaintiff] must establish [that he] was deprived of a right 'secured by the Constitution and laws' of the United States, and . . . [that] the deprivation was caused by a person or persons acting under color of state law." Ottman v. City of Independence, Mo., 341 F.3d 751, 756 (8th Cir. 2003) (citations omitted). There is no indication that the defendant acted under color of state law when it allegedly discriminated and retaliated against the defendant. Therefore, I find that to the extent that the plaintiff's claims are based upon § 1983, the defendant is entitled to summary judgment.

#### B. Race Based Discrimination in Violation of Title VII and Section 1981

Count III of the second amended complaint alleges that the defendant discriminated against the plaintiff based on his race in violation of Title VII and 42 U.S.C. § 1981. (See Second Am. Compl., filing 50, ¶¶ 21-23.) Although there are differences between the two statutes, "[t]he elements of claims alleging disparate treatment on the basis of race under Title VII and intentional employment discrimination on the basis of race under § 1981 are identical." Kim v. Nash Finch Co., 123 F.3d 1046, 1063 (8th Cir. 1997). Because the plaintiff has not come forward with direct evidence of discrimination, his claims will be assessed using the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). See, e.g., Johnson v. AT & T Corp., 422 F.3d 756, 761 (8th Cir. 2005). Under this framework, the plaintiff must first establish a prima facie case of race discrimination. To do so, he must show that "(1) he is a member of a protected class; (2) he applied and was qualified for a job for which the employer was seeking applicants; (3) he was rejected; and, (4) after he was rejected, [the defendant] continued to seek applicants with [the plaintiff's] qualifications." Harrison v. United Auto Group, 492 F.3d 972, 974 (8th Cir. 2007). "Second, if the plaintiff establishes a prima facie case, the defendant must 'rebut the presumption of discrimination [raised by the

prima facie case] by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.' Third, if the defendant carries this burden, the plaintiff is entitled to the opportunity to show that the defendant's articulated reason was in fact 'not the true reason for the employment decision' and a 'pretext for discrimination.'" Kim, 123 F.3d at 1056 (citations omitted).

The defendant argues that it is entitled to summary judgment because the plaintiff cannot establish a prima facie case of discrimination and because the defendant had legitimate, nondiscriminatory reasons for rejecting the plaintiff's applications. I shall consider each of these arguments in turn.

1. The Plaintiff's Prima Facie Case

The defendant argues that it is entitled to summary judgment because the plaintiff cannot establish elements two and four of a prima facie case of race discrimination. (See Def.'s Br., filing 75, at 29-32.) My analysis of each of the defendant's arguments follows.

The defendant claims that the plaintiff cannot satisfy element two of a prima facie case because the plaintiff was not qualified for many of the positions that he applied for between March 2003 and December 2005. (See Def.'s Br., filing 75, at 29.) More specifically, the defendant argues first that the plaintiff was not qualified for positions 1, 2, 5, 28, and 31 because a bachelor's degree was required for these positions, and the plaintiff lacked a bachelor's degree at the time of his applications. (Id. at 29-30.) It is true that the plaintiff did not possess a bachelor's degree when he submitted his applications, and the defendant's evidence does indicate that bachelor's degrees were required for positions 1 and 28. (See Def.'s Facts ¶ 27.) However, the qualifications for position 2 included a bachelor's degree or "equivalent experience," and the postings for positions 5 and 31 stated only that candidates with bachelor's degrees would be "preferred." (See Def.'s Index, Ex. 82, Sherlock Dec. ¶¶ 13, 16, 41.) I therefore find that the plaintiff has failed to establish a prima facie case of discrimination with respect to positions 1 and 28, but I am not persuaded that there is no genuine issue as to whether the plaintiff was qualified for positions 2, 5, and 31.

Next, the defendant argues that the plaintiff cannot show that he was qualified for positions 4, 6, 14, 17, 22, 24, 25, 35, 36, and 37 because those positions were open only to

10

"internal BNSF employees." (Def.'s Br., filing 75, at 30.) The plaintiff was not employed by the defendant at the time of his applications, and the defendant's evidence establishes that only current BNSF employees would be considered for positions 4, 6, 14, 24, 25, 35, 36, and 37. (See Def.'s Facts ¶ 26.) It is also undisputed that the "FLS Assessment Center Posting for Transportation, Engineering, Mechanical, Clerical," code KJ12030, "was an invitation <u>to BNSF employees</u> to be tested to become First Line Supervisor ('FLS') certified." (Def.'s Index, Ex. 82, Sherlock Dec. ¶ 24 (emphasis added).) Therefore, the plaintiff cannot establish a prima facie case of discrimination with respect to these positions. However, the evidence submitted by the defendant states only that current employees were "strongly preferred" for positions 17 and 22. (See Def.'s Index, Ex. 82, Sherlock Dec. ¶¶ 25, 31.) As a result, I am not persuaded that the plaintiff cannot show that he was qualified for positions 17 and 22 merely because he was not a BNSF employee at the time of his applications.

The defendant argues next that the plaintiff lacked certain qualifications for a number of other positions. (See Def.'s Br., filing 75, at 30-31.) Specifically, the defendant argues that the plaintiff lacked first line supervisor certification, which were qualifications for positions 17 and 29, (id. at 30), and that the plaintiff lacked the characteristics of the "ideal candidate" for position 22, (Def.'s Index, Ex. 82, Sherlock Dec. ¶ 31).[6] The defendant also argues that the plaintiff "lacked the operations management experience required for the Asst Manager Hub Operations position," which is position number 31 on the foregoing chart. (Def.'s Br., filing 75, at 30.) After carefully considering the evidence submitted in support of the defendant's arguments, I find that the plaintiff was not qualified for positions 17 and 29. A genuine issue remains, however, as to whether the plaintiff can establish a prima facie case with respect to positions 22 and 31.

Finally, the defendant argues that the plaintiff was not qualified for position 30 because he lacked two years of experience as a train dispatcher; that the plaintiff was not qualified for

---

[6] In its brief, the defendant mis-designates position number 24 as number 23, position number 35 as number 24, position number 36 as number 25, and position number 37 as number 26. (See Def.'s Br., filing 75, at 30-31.) I have already concluded that the plaintiff was not qualified to fill positions 24, 35, 36, and 37 because those positions were open only to then-current BNSF employees.

11

positions 7-10 because he lacked "prior experience in operations in a supervisor role"; that the plaintiff was not qualified for position 11 because he lacked "previous experience in a leadership role or a bachelor's degree"; and that the plaintiff was not qualified for position 15 "because he only scored 27% on the test he took at the time he applied for the position." (Def.'s Br., filing 75, at 31.) I have carefully considered the evidence submitted by the defendant, and I find that the defendant has established that the plaintiff was not qualified for positions 30 and 7-10. A genuine issue remains as to whether the plaintiff was qualified for positions 11 and 15.

As noted above, in order to establish the fourth element of a prima facie case of race discrimination in a "failure to hire" context, plaintiffs must show that after they were rejected for a position, the employer "continued to seek applicants with [the plaintiff's] qualifications." Harrison v. United Auto Group, 492 F.3d 972, 974 (8th Cir. 2007). The defendant suggests that the plaintiff cannot establish this element with respect to a number of positions, including numbers 11, 16, 21, and 39, because the defendant did not hire anyone to fill those positions. (See Def.'s Br., filing 31, at 31.) It seems to me, however, that it does not follow from the fact that no applicants were ultimately hired for these positions that there is no genuine issue as to whether the defendant "continued to seek applicants with [the plaintiff's] qualifications" after rejecting the plaintiff. In other words, I am not persuaded that the plaintiff cannot establish element four of his prima facie case with respect to positions 11, 16, 21, and 39.

In summary, I find that the defendant has established that the plaintiff is unable to establish a prima facie case of race discrimination with respect to positions 1, 4, 6, 7, 8, 9, 10, 14, 17, 24, 25, 28, 29, 30, 35, 36, and 37, along with position number KJ12030. To that extent, the defendant is entitled to summary judgment.

2. The Defendant's Legitimate, Nondiscriminatory Reasons for Rejecting the Plaintiff's Applications

The defendant argues that even if the plaintiff can establish a prima facie case of race discrimination, summary judgment is appropriate because the defendant had legitimate, nondiscriminatory reasons for failing to hire the plaintiff for each of the relevant positions. (Def.'s Br., filing 75, at 32-34.) "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence."

Davis v. KARK-TV, Inc., 421 F.3d 699, 705 (8th Cir. 2005) (quoting Floyd v. Mo. Dept. of Soc. Servs., Div. of Family Servs., 188 F.3d 932, 936 (8th Cir. 1999)). As noted above, if the defendant satisfies this burden, it falls to the plaintiff "to produce evidence sufficient to create a genuine issue of material fact whether [the defendant's] proffered nondiscriminatory reason was a pretext for discrimination." Id. (citation omitted).

The defendant argues first that it had legitimate, nondiscriminatory reasons for failing to hire the plaintiff because he did not have the requisite "education, experience, or . . . employment with the BNSF at the time he made his application." (See id. at 32.) I shall focus my attention upon those positions that have not already been eliminated from consideration on the ground that the plaintiff cannot establish that he was qualified, though it is certainly true that the defendant possessed legitimate, nondiscriminatory reasons for failing to hire the plaintiff to fill positions for which he was not qualified (i.e., positions 1, 4, 6, 7, 8, 9, 10, 14, 17, 24, 25, 28, 29, 30, 35, 36, 37, and KJ12030).

The defendant's evidence establishes that candidates with bachelor's degrees or equivalent experience were sought for position 2, and that candidates with bachelor's degrees were "preferred" for positions 5 and 31. (See Def.'s Facts ¶ 27 (citing Def.'s Index, Ex. 82, Sherlock Dec.).) The defendant's evidence also shows that the three persons selected to fill position 2 each had "either a bachelor's degree or equivalent human resources experience," that the person selected to fill position 5 had a bachelor's and master's degree, that the person hired to fill position 31 had a bachelor's degree and "at least two years of operations management experience," and that the plaintiff lacked the degrees and experience of the selected candidates. (See Def.'s Index, Ex. 82, Sherlock Dec. ¶¶ 13, 16, 41.) I therefore find that the defendant has come forward with a legitimate, nondiscriminatory reason for failing to hire the plaintiff to fill positions 2, 5, and 31.

Similarly, the defendant's evidence establishes that applicants with "previous experience in a leadership role and a bachelor's degree" would be "preferred" for position 11, that the defendant lacked a bachelor's degree and the relevant experience, and that no person was hired to fill the position. I find that the defendant's lack of preferred qualifications amounts to a legitimate, nondiscriminatory reason for rejecting the plaintiff's application.

13

The defendant's evidence also establishes that internal candidates were "strongly preferred" for position 22, that the plaintiff was not an internal candidate at the time of his application, and that the person selected to fill the position was an internal candidate. (See Def.'s Index, Ex. 82, Sherlock Dec. ¶ 31.) Thus, the defendant has come forward with a legitimate, nondiscriminatory reason for failing to hire the plaintiff to fill position 22.

Finally, the evidence establishes that the plaintiff completed an "on-line screen test" at the time he submitted his application for position 15, that he scored 27% on this test, and that the two persons hired to fill the position each scored 100% on the test. (See Def.'s Index, Ex. 82, Sherlock Dec. ¶ 23.) The defendant has therefore articulated a legitimate, nondiscriminatory reason for rejecting the plaintiff's application for position 15.

The defendant also submits that it "has a policy . . . of not interviewing applicants who do not live in the geographical area of the position if there are sufficient qualified applicants who have applied," and that this policy amounts to a legitimate, nondiscriminatory reason for rejecting the plaintiff's application for several positions, including numbers 3, 12, 13, 18, 19, 20, 21, 32, 33, 34, 39, and 40. (Def.'s Br., filing 75, at 32-33.)[7] Carmen Turner describes the rationale for the defendant's policy as follows:

> It has been my experience both as a BNSF Human Resource Manager and as a roving Human Resource Manager that the BNSF attempts to limit the applicants who are interviewed to those who live in the geographic area of the open position. A person who lives in Nebraska, as Robinson did, would not be invited to an interview in California. The BNSF does not pay the travel expenses to bring a candidate from out of state to the interview, nor the moving expenses if the person were hired. Additionally, there is a huge difference in the cost of living between California and Nebraska. The hourly rate for union positions would remain the same, regardless of the location of the position. So the likelihood of an applicant showing up for an interview and moving to California are [sic] extremely slim. It therefore is more time and cost efficient to limit applicants who are interviewed to those living in the area.

(Def.'s Index, Ex. 86, Turner Dec. ¶ 7.) Although not all of the positions listed immediately

---

[7]In its brief, the defendant mis-designates positions 12, 13, 15, 16, 18, 19, 20, and 21 as positions 13, 14, 16, 17, 19, 20, 21, and 22, respectively. (See Def.'s Br., filing 75, at 33.) I note in passing that the viability of the plaintiff's claims with respect to positions 15 and 16 are addressed elsewhere in this memorandum.

above were located in California–which limits the relevance of a portion of the rationale articulated by Turner–it seems to me that the defendant has articulated a legitimate, nondiscriminatory basis for declining to interview the plaintiff for positions 3, 12, 13, 18, 19, 20, 21, 32, 33, 34, 39, and 40.

By my count, only positions 16, 23, 26, 27, and 38 remain to be considered. The defendant has submitted evidence that it invited the plaintiff to interview for position 16, but that the plaintiff failed to appear for his scheduled interview on March 26, 2004. (See Def.'s Br., filing 75, at 33 (citing Def.'s Index, Ex. 82, Sherlock Dec. ¶ 26).) This, it seems to me, amounts to a legitimate, nondiscriminatory reason for the defendant's failure to hire the plaintiff for position 16.

With respect to position 27, the defendant submits that the plaintiff applied for the position on November 19, 2004, that the defendant received 94 applications for the position, and that Sherlock decided "to give other qualified applicants an opportunity to interview for the position" because the plaintiff failed to appear for his interview for position 16 earlier that year. (Def.'s Br., filing 75, at 33-34; Def.'s Index, Ex. 82, Sherlock Dec. ¶ 36.) I find that the defendant has satisfied its minimal burden of coming forward with a legitimate, nondiscriminatory reason for declining to interview the plaintiff for position 27.

The defendant submits that the plaintiff was not interviewed for position 23 because the plaintiff lacked "the skill sets that other applicants had that were known by experience to translate well to the position," such as a background in auto repair. (Def.'s Br., filing 75, at 34 (citing Def.'s Index, Ex. 82, Sherlock Dec. ¶ 32).) In addition, the defendant's evidence indicates that all eight persons hired for position 23 had the preferred "skill sets." (See id.; see also Def.'s Index, Ex. 82, Sherlock Dec. ¶ 32.) Similarly, the plaintiff was not interviewed for position 26 because the plaintiff's "application did not reveal that he had any background related to the job duties of a pipefitter, such as inspecting and repairing piping on locomotives," and the four persons who were hired to fill position 26 had relevant experience. (Def.'s Index, Ex. 82, Sherlock Dec. ¶ 35.) Therefore, I find that the defendant has articulated a legitimate, nondiscriminatory reason for declining to interview the plaintiff for positions 23 and 26.

As I noted above (see supra Part I), the plaintiff was interviewed for position 38 by

Carmen Turner. A "structured interview guide" was used to score all of the interviews for the position, and the plaintiff's score of 18 was lower than the scores of the fifty-nine individuals who were hired to fill position 38. (Def.'s Facts ¶ 40; see also Def.'s Index, Ex. 82, Sherlock Dec. ¶ 47; id., Ex. 86, Turner Dec. ¶¶ 4-6.) This amounts to a legitimate, nondiscriminatory reason for the defendant's failure to hire the plaintiff for position 38.

The defendant has come forward with legitimate, nondiscriminatory reasons for its decisions not to select the plaintiff for any of the openings that form the basis of the plaintiff's discrimination claim. This shifts the burden to the plaintiff to come forward with "evidence sufficient to create a genuine issue of material fact whether [the defendant's] proffered nondiscriminatory reason[s were] . . . pretext[s] for discrimination." Davis v. KARK-TV, Inc., 421 F.3d 699, 705 (8th Cir. 2005) (citation omitted). The plaintiff has failed to satisfy this burden.

I note in passing that the plaintiff has filed a motion asking that I reconsider my order denying his request for leave to file a response to the defendant's summary judgment motion, and that the plaintiff's proposed response brief is attached to that motion. (See filing 100.) I have studied the plaintiff's response brief, and I find that it does not raise a genuine issue of material fact as to whether the defendant's proffered nondiscriminatory reasons were pretexts for unlawful discrimination. In his proposed brief, the plaintiff argues that he "can raise genuine doubt as to the legitimacy of BNSF's motives in failing to hire him for the thirteen positions for which he applied after he had filed his discrimination claim with the NEOC in 2004," and that he "can also raise genuine doubts as to the legitimacy of BNSF's motives in failing to hire him after interviewing him for [position 38] in Omaha, Nebraska, on January 4, 2006." (Filing 100, Attach. 1, Pl.'s Br. at 10.) More specifically, the plaintiff argues,

> BNSF claims that it did not hire Robinson for these positions either because he was not educationally qualified for all these positions, he was not within the geographical range for these positions, or that he did not score within the range for people who were eventually hired for the positions. This argument fails because Robinson was educationally qualified for the Mechanical Laborer position in Havelock, NE [position 27]. This position was located in Havelock, Nebraska and this area was within Robinson's geographical range. Robinson had also performed this job during his prior tenure as a BNSF employee up till 1994, so he was qualified to perform this job. Similarly Robinson was qualified,

16

> educationally, geographically, and otherwise for the Track Maintenance positions for which he applied in 2006. Robinson meets the prima facie requirements for failure to hire discrimination in both these instances . . . .

(Id. at 10-11.)

The plaintiff's argument that he was qualified, both educationally and "geographically," for position 27 is well-taken. Indeed, the defendant has not argued that the plaintiff was not qualified for this position. As noted above, however, the defendant argues that it decided not to interview the plaintiff for this position because it received a large number of applications from qualified candidates, and it decided to schedule interviews with those candidates first because the plaintiff failed to appear for an interview earlier that year. (Def.'s Br., filing 75, at 33-34; Def.'s Index, Ex. 82, Sherlock Dec. ¶ 36.) The plaintiff's argument that he was qualified for position 27 does not speak to that point at all, and I must conclude that the plaintiff has not raised a genuine issue as to whether the defendant's proffered explanation is merely a pretext for discrimination. Similarly, the plaintiff's argument that he was qualified "for the Track Maintenance positions for which he applied in 2006" seems to miss the mark. (Filing 100, Attach. 1, Pl.'s Br. at 11.) Preliminarily, I note that there is no evidence before me that the plaintiff applied for a Track Maintenance position, or any other position, in 2006. I take it that the plaintiff means to refer to position 38, which was a Track Maintenance position in Omaha, Nebraska, that the plaintiff applied for in December 2005. Again, the defendant does not argue that the plaintiff was not qualified for this position; rather, it claims that the plaintiff was interviewed for the position, and the selected candidates scored better than the plaintiff on their structured interviews. The plaintiff has not come forward with evidence that could support a finding that the selected candidates were actually preferred for an illegitimate (i.e., discriminatory) reason.

Because the defendant has come forward with evidence of legitimate, nondiscriminatory reasons for failing to hire the plaintiff for all of the positions at issue, and because the plaintiff has failed to raise a genuine issue as to whether those reasons were in fact pretexts for unlawful discrimination, I must conclude that the defendant is entitled to summary judgment on Count III of the second amended complaint.

### C. Retaliation in Violation of Title VII and Section 1981

Counts I and II of the second amended complaint allege that the defendant retaliated against the plaintiff in violation of Title VII and 42 U.S.C. § 1981. (See Second Am. Compl., filing 50, ¶¶ 15-20.) The same McDonnell Douglas analytical framework is applied to retaliation claims under either statute. See Kim v. Nash Finch Co., 123 F.3d 1046, 1060 (8th Cir. 1997). "The elements of a retaliation claim under § 1981 and Title VII are (1) protected activity, (2) subsequent adverse employment action, and (3) a causal relationship between the two." Id. If a plaintiff makes this prima facie showing, the burden to articulate legitimate, nondiscriminatory reasons for its decisions shifts to the defendant. See Bainbridge v. Loffredo Gardens, Inc., 378 F.3d 756, 760 (8th Cir. 2004). If the defendant satisfies this burden, the plaintiff must show that the defendant's reasons are in fact pretexts for retaliation. See id.

In support of its motion for summary judgment, the defendant argues, among other things, that it had legitimate, nondiscriminatory reasons for failing to hire the plaintiff for any of the relevant positions. (See Def.'s Br., filing 75, at 39 ("Robinson was not hired for the 40 positions at issue between March 2003 through December 2005 because he was either not qualified, failed to show up for an interview, his residence was not in the area of the position, or he was not the best qualified candidate.").) I have carefully considered the defendant's arguments, and I agree that the defendant has satisfied its burden of coming forward with evidence that the plaintiff was not hired for legitimate, nondiscriminatory reasons. (See supra Part III.B (analyzing defendant's proffered reasons for failing to hire the defendant).) Furthermore, I find that the plaintiff has failed to satisfy his burden to come forward with evidence that raises a genuine issue as to whether the defendant's proffered reasons were pretexts. (See supra Part III.B.2 (discussing the plaintiff's failure to establish pretext).)[8] Therefore, the defendant is entitled to summary

---

[8]I note in passing that the plaintiff argues in his proposed response brief that the defendant's employees would have evaluated the plaintiff's personnel file when the defendant invited the plaintiff for an interview for position 16 and when it actually interviewed the plaintiff for position 38, and therefore the defendant's employees would have been aware of the plaintiff's prior charges of discrimination. (Filing 100, Attach. 1, Pl.'s Br. at 11.) It is true that the defendant has admitted that "[s]ometimes the personnel file will be pulled before an interview and sometimes it will be pulled after an interview if the BNSF is considering hiring the person for that position." (Def.'s Index, Ex. 90, Hishaw Dec. ¶ 8.) The plaintiff can only speculate,

judgment on the plaintiff's retaliation claims.

**IT IS ORDERED** that:

1. The defendant's motion for summary judgment, filing 74, is granted;

2. The plaintiff's motion for reconsideration, filing 100, is denied, though I have considered the arguments raised by the plaintiff in the response brief attached to that motion; and

3. The defendant's motion in limine, filing 90, and the plaintiff's motions in limine, filings 92 and 94, are denied as moot.

Dated March 17, 2008.

BY THE COURT

s/ Warren K. Urbom
United States Senior District Judge

---

however, whether the defendant's employees reviewed the plaintiff's file before the interview for position 16 (which the plaintiff failed to attend), and the defendant's uncontradicted evidence establishes that the employee who interviewed the plaintiff for position 38 "did not have any knowledge of any prior charge of discrimination" when she scored the plaintiff's interview. (Def.'s Index, Ex. 86, Turner Dec. ¶ 6.) In any case, I am not persuaded that the defendant's proffered nondiscriminatory reasons for failing to hire the plaintiff were pretextual.